Good afternoon. I'm John Rhodes from the Missoula office of the Federal Defenders of Montana. With me at council table is Marla Prothrow. She's a third-year law student at the University of Montana School of Law. She's with me on the briefs representing Mr. Kuntz. I would like to reserve two minutes for rebuttal. Relying on hearsay in revocation proceedings violates due process unless the government's good cause for denying it outweighs Mr. Kuntz's right to confront the hearsay. Well, let's start there, counsel. In United States v. Martin, there the defendant was denied virtually any opportunity, but here that was not the case, right? No. Mr. Kuntz was denied the opportunity to confront the sweat patches at every turn. Well, but didn't he have an opportunity – I think the language of Martin is pretty broad, wouldn't you agree? I mean it says that in that case there was virtually no opportunity, and here Mr. Kuntz had the opportunity to present evidence, cross-examine witnesses, a probation officer, present other pieces of evidence. Why isn't that enough? Martin did use the word virtually. Here, the reason it wasn't enough is because under the Comito balancing test, the district court exclusively relied on the sweat patches when it announced its ruling. And that's what the government argued. The government exclusively relied on the sweat patches in arguing to the district court. Counsel, I understand from the record that your client did ask for an opportunity to retest the patches and was denied. Was that request renewed at all before the district court judge? No. The way revocation works, at least in Montana, it's very quick. The initial appearance was March 27th. I believe the final revocation hearing was April 16th. But Mr. Kuntz, when he learned of the positive sweat patch, he asked for retesting, he asked for urinalysis, he asked for daily urinalysis, he asked to take a polygraph. He asked his probation office everything he could think of. And then after he was arrested on the violation petition, that's when, well actually it was before that, he did the hair follicle test. And then that's when he was polygraphed. And that gets back to Judge Mendoza's question about our ability to confront the sweat patches. The evidence that we offer, the polygraph test and the hair follicle test, both negative, in other words supporting Mr. Kuntz, the district court referred to those tests as meaningless. And again, the court exclusively relied on the sweat patches in explaining its ruling. I just want to clarify, you're challenging both the lack of opportunity essentially to confront the lab technicians, let's say, who actually conducted the sweat patch tests. Are you also confronting the use of the hearsay from the toxicologist or the administrator who essentially opined on how to interpret those tests or whether they could be possibly consistent with anything but current use? Absolutely. The probation office, and this was unbeknownst to us until the hearing, she spoke to the lab, asked the questions she wanted to ask. And then when I tried to confront the probation officer to ask questions that I would ask a toxicologist, she was candid. She said, I'm not a lab technician. And I was focusing on perhaps historic cocaine use, somehow excreting at a later time. She couldn't answer that. There were, if you look at the lab reports, there's descending nanograms. I think it started with 44 and it got down to something like 16 nanograms, 10 nanograms that cut off for positive. And there were alternating positive sweat patch, negative sweat patch, positive, negative, positive, negative. There was no way for us to question any of that evidence because she wasn't in a position to answer it. Did the government give any reason for the unavailability of the lab checks? Were they required to give any reason? And does that matter to our analysis here? It definitely matters. Under what the courts sometimes call the Comedo Balancing Test, you have to weigh the significance of the unconfrontable hearsay. Here are the sweat patch test results. And then the probation officer's testimony and the district court's reference to experts in other cases against the government's good cause for denying it. Here, the government offered nothing. And in Comedo, they said that means there's nothing to put on that side of the scale. I've litigated the sweat patch in many cases for at least a decade. Frequently, the government has a toxicologist, not somebody from the lab report, but a Stanford toxicologist testify about the sweat patch. He actually is a consultant with PharmChem, the company that manufactures the sweat patch. So he testifies via video. Right to confrontation is permitted. Was there an affidavit or something that was provided? Nothing. That's my next point. Unlike Sixth Amendment confrontation at trial, where the Supreme Court's made clear in the Crawford line of cases culminating most recently with Arizona v. Smith, there you can't rely on affidavits. You've got to have a live witness. In the revocation process in the court's case law, it's recognized that affidavits could be sufficient. And I can think of one case I had with a positive THC marijuana sweat patches. That's exactly what the prosecution did. But here, there was nothing. Wouldn't an affidavit have been sufficient in this case? I mean, if, for example, the toxicologist, apparently part of the hearsay testimony is I think the PO officer asked essentially, you know, could this be consistent with past use versus current use? And the answer was no. I mean, I assume you would have asked other questions, right, to probe that answer. I think that's part of what the issue is here. Would you have had the opportunity to do that if they had just submitted an affidavit? I would hope the affidavit would be comprehensive enough to get ahead of the questions I would ask. In this instance, the question that you just posed was not asked by the probation officer. That's what I tried to ask her, and she simply couldn't answer it. What she asked about was environmental contamination. Okay. Thank you for refreshing my memory. And is there anything in the record? You mentioned that you had an exchange with the PO about asking additional questions. And is that in the record? Yes. Yes. I believe it's ER 44. But it would be during my cross-examination. And I started to ask her questions. And, again, she was candid. She said, I'm not a lab technician. I see you were asking the PO when they were on the scan how to explain these other things. And they said they're not a toxicologist. Yeah. Versus asking for the opportunity to ask the toxicologist directly. Did you ever – is there anything in the record about that? No. I tried to ask the probation officer about historic cocaine use. In other words, in the past, somehow excreting in the present. And she couldn't answer that. I was going to ask about these alternating positive and negative tests. But she had already said, I'm not a lab technician. I was going to ask about the nanograms that were reported. Because it went from 44 to 20.8 to 13 nanograms. Again, with negatives in there. I was going to ask about that to sending nanograms. But she made it clear she couldn't answer that. Sir, you represented us. These are the types of questions you would have asked if they had actually put a toxicologist on the scan. Most definitely. And I also asked her about how much cocaine use, in terms of ingested cocaine, would correlate to these nanogram readings. And she was unable to do that. I see it here on ER 46. Yes. Yes. That's when she says, I do not – I'm not a lab technician. And I, in one case, and when I get up on rebuttal, I can cite it to the court or do a 28-J follow-up. I beat the sweat patch in one case where the toxicologist testified. And basically, it was a very low methamphetamine nanogram reading. And he said that would correlate to this much ingested methamphetamine. My client, fortunately recovering addict, but he's an addict. He got up and testified, I'm an addict. I'm not going to use that little bit of methamphetamine. If I'm going in, I'm going all in. And those are simply the kind of questions that we weren't permitted to ask. I see I've got less than a minute, so I'll reserve for rebuttal. Thank you. Good afternoon, Your Honors. May it please the Court. Kelsey Sable from the District of Montana on behalf of the United States. Under the Comito balancing test that applies, the District Court correctly admitted the lab reports and the testimony of the probation. You're going to say that the District Court did not do a Comito balancing test, though, correct? It's true that the District Court did not expressly conduct the balancing test. Well, not expressly. They specifically didn't. Did not conduct the balancing test, Your Honor. That's true. But now we're here on DeNova review, and so now this court can conduct the balancing test and consider the factors such as the defendant. I don't see how we can conduct the test when the government did not offer in the trial court any good cause for not producing the technician. I mean, that's the question that I'm really struggling with, is what is on that side of the balancing test? What's the good cause? I mean, there was no evidence of that. Yes, Your Honor, we did not present any evidence in the District Court. That's absolutely correct. But it is clear from the record before this court that these testing chemists were out of state. The lab reports themselves and excerpts of the record 141 through 147 say Kansas on them. So it's clear that these witnesses would be traveling to Montana from out of state to testify. It's clear from the lab reports, the identifiers referencing the testing chemists, that there would be multiple witnesses that would need to testify to the positive. Right. I'm sorry. Go ahead. I was going to say, wouldn't remote appearance be an option? Remote appearance would be an option, Your Honor, but I don't think that necessarily solves all of the difficulty and expense and resource allocation with calling these witnesses. But none of that was presented to the District Court, right? That's correct, Your Honor. It was not presented to the District Court. So we have to sort of glean that that's what you were thinking. Well, I think the District Court did reference, and it's at excerpts of the record ER 129, that he has been a District Court judge for a long time. He's presided over a lot of these— On this point, though, I guess I have a question. I think the District Court did say he has indicated that he has experience in over 500 cases in other hearings and that therefore believes that these tests are inherently reliable. How is anyone who's standing before that judge able to challenge that kind of evidence, extra evidence that they don't have the ability to confront? How is anyone supposed to do that? Well, so I think, Your Honor, in the context of this case, it's important to sort of remember the nature of Mr. Kuntz's challenge to the sweat patch test. And Mr. Kuntz did not challenge the fact that the sweat patches were positive. That is not the argument that he advanced before the District Court. He said positive sweat patches do not equal cocaine use. And the reason for that was this argument that it was sort of residual stored cocaine that was excreted through his body. So the inherent reliability of the sweat patches aren't really central to this argument. I mean, I think the discussion with my colleague was really illuminating as to this point. The type of questions that he would be asking a witness, a toxicologist or someone else, those are not questions to ask the testing chemist who received this sample and tested it and said, yes, it's positive. But that's not the only person that is missing from this, right? So the PO testified to an email exchange they had with the toxicologist and an explanation for whether there's any other essentially potential explanation other than ingestion as a cause of a positive test. It seems to me that is also significant hearsay that's relevant to the defense's theory, which is that there's some other possible explanation for the positive test in the intermittent nature and the levels detected that there could be some other explanation. And to the extent that there was a hearsay testimony about an email exchange with a toxicologist that said the only explanation essentially is ingestion, that that should have been subject to cross-examination. Well, so I think, Your Honor, two points on that. Firstly, the probation officer did not testify specifically to a conversation about Mr. Kuntz's defense, the residual excretion defense. But more importantly, Your Honor, I think that goes to the factor that was discussed at length in Martin, which is a different or an ability to refute the evidence in another way. And so Mr. Kuntz absolutely could have presented evidence of his residual excretion theory through his own witness. I mean, there is no magic to cross-examining the testing chemist or the operations manager at the lab or whomever the probation officer spoke to. I mean, he could subpoena his own toxicologist, his own expert witness to opine on these issues about the nanograms and the levels and what does it mean when positive tests are interspersed with negative tests. And is this residual excretion positive? And would that result in positive and negative tests repeating? All of this could have been avoided had there been an affidavit, had there been virtual testimony, had there been any of that which was not provided to the district court, correct? I don't agree with that respectfully, Your Honor, because I think the affidavit wouldn't really solve the confrontation issue that has been raised. I mean, if we were to submit an affidavit, we would, you know, the violation is use of cocaine. And we prove that in part through the sweat patch tests. And so we would introduce affidavits from the testing chemists and the affidavits would say essentially what the lab reports say. I received this sample on this date. I tested it. It tested positive. And then we would rely on that and all of the other, you know, evidence supporting that, the drug paraphernalia found and those other types of things. But we, you know, we didn't know, I don't believe that there was this residual excretion argument until, you know, the revocation hearing. And so an affidavit wouldn't speak to that. And an affidavit wouldn't provide that information, you know, relevant to that defense. And so I don't believe that an affidavit would serve that, the confrontation issue in this case. Can you point me to any cases where the government has failed to offer any good cause for not producing witnesses and still succeeded under the Comito balancing test? Do you have any cases? I'm not aware of any, Your Honor. You know, I do know that the district court, you know, did not conduct the Comito balancing test in Comito and Hall. And, of course, the government did not prevail in those cases. But I think those cases are significantly distinguishable in a way that's very important to this case. And I say that because both of those cases where the defendant's interest outweighed the government's good cause was those cases involved, you know, unsworn verbal statements from third parties, sort of interested third parties who had some sort of personal interest or involvement in this case. And under those circumstances, you know, this court held that the defendant's interest in confronting those witnesses outweighed the government's good cause. And that makes sense because when you have a witness who's saying, you know, like in Comito, the witness saying, he used my credit cards without permission and the defendant saying, no, I had permission. There's a real interest in getting these witnesses before the district court and allowing him to listen to their testimony and judge their credibility and make that determination. You know, but in this case, you know, we have the good cause and the reliability of the evidence, you know, sort of go hand in hand in that, you know, we have inherently reliable scientific tests, you know, reliability, not just on the basis of the test, but also on based on all of the other evidence that is supporting these positive tests. I guess I'll ask you, are you aware of any cases where we just didn't require good cause at all, or we just said, we're going to, we're just going to not do this Comito balancing test. We don't need good cause. No, Your Honor, I think the court absolutely does have to weigh the government's good cause. But I would just say again that, you know, the district court did not, you know, conduct that test in Comito and Hall and then this court reviewed the record and did that test. And I would just point the court again, you know, to the lab reports establishing that these witnesses are out of state. I mean, to the question of earlier about video testimony, you know, there still is a difficulty, you know, and a resource allocation necessary to do that. And not just for the government, but for the court also. But again, that's on one side of the ledger and the other side of the ledger, which is important, is the confrontation and the right of that individual to confront that witness. And that is not here. That is true, Your Honor. I mean, I'm not saying there's there's no interest in confronting the witnesses. I you know, but again, when we look at the defendant's interest, you know, we look at the nature of the facts proven by the evidence, you know, the importance of those specific facts and the reliability of the evidence. And so, I mean, again, I mean, if Mr. Kuntz was going to cross examine these testing chemists about whether residual excretion can can cause these kind of positive tests. I mean, I mean, we would object to that. That's beyond the scope of their testimony. It's beyond the scope of their work in this case. And he has another avenue to do that. He can absolutely retain his own expert witness. I mean, as you know, as my colleague has referenced us doing in the past, if this was an argument that he wanted to advance, he had a way. I apologize, Your Honor. No, I just have two questions. One, did the email exchange between the PO and the toxicologist about possible explanations for the test come into the record? No, Your Honor. Before the district court? The probation officer's testimony did, but I don't believe the email itself did. No, Your Honor. OK, and then the in Martin, we noted that the defendant had asked for the opportunity to retest the sample and it was denied. I believe the defendant here testified that he asked the PO if he could get the samples retested and that request was denied. Why doesn't that fact weigh in his favor? Your Honor, I see that I'm out of time. May I briefly respond? Thank you, Your Honor. So, Mr. Kuntz did not ask, he asked for an opportunity to conduct different testing, urinalysis testing, hair follicle testing. And the reason that was not approved, as the probation officer testified at the revocation hearing, is those methods of testing are not approved by the court. They're not as reliable as the sweat patch testing. And he did, of course, go out and get a hair follicle test and a polygraph test. And he submitted those lab reports to the court and absolutely could have called those witnesses to testify at the revocation hearing if he had wanted to do so. Thank you, Your Honors. Thank you. I've got five points I'd like to make. I'll try to be fast. First, this idea that we have to bring in our own expert. That's not the defendant's burden. That's not how due process works. That's not how the right to confrontation works. That's where the Crawford line of cases is informative. Also, regarding the Crawford line of cases, there's not some sort of lab report exception to confrontation or, in the revocation context, due process. The government's wrong when it says that the cases that support us from this court are only eyewitness-type, street-type testimony. Martin involved urinalysis test. All 28J, the case I referenced, I don't take the court's time today regarding that. Also, this idea of it was too expensive. The court may know it cost about $51,000 a year to incarcerate somebody. So Mr. Kuntz got a sentence that cost the taxpayers as much as over $100,000, and it's his liberty. I don't think it's too expensive to fly in a witness or to arrange for remote testimony via video. That happens routinely in district courts, at least in Missoula, I presume across the country. And then finally, the government's resorting to what it did at its briefing, that there's some sort of sweat patch or lab report exception to due process, and that's not the case. Otherwise, why have a balancing test? Comedo's out the window. Martin's out the window. Due process is out the window. Why even have a hearing? The sweat patch is summarily dispositive under the government's theory. For that reason, Your Honor, we're asking that the court vacate Mr. Kuntz's revocation judgment and remand for further proceedings. Thank you, counsel, for your helpful evidence.
judges: SUNG, THOMAS, MENDOZA